IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

| | |
|---|---|
| THE ARTHUR L. CHRISTOFFERSEN IRREVOCABLE TRUST, u/d/o 11/19/1991, by and through its co-trustees, Theresa A. Christoffersen, Dawn Christoffersen Minkoff and Eric Matthew Christoffersen,<br><br>Plaintiff,<br><br>vs.<br><br>YELLOW BOOK USA, INC.,<br><br>Defendant. | No. 06-CV-79-LRR<br><br>**ORDER** |

_____

*TABLE OF CONTENTS*

*I.   INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *2*

*II.  PROCEDURAL BACKGROUND* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *2*

*III. SUMMARY JUDGMENT STANDARD* . . . . . . . . . . . . . . . . . . . . . . . . . . *3*

*IV.  MATERIAL FACTS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *4*
    *A.   Parties* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *4*
    *B.   Contracts* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *5*
        *1.   Release* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *6*
        *2.   Consulting Agreement* . . . . . . . . . . . . . . . . . . . . . . . . . *8*
    *C.   Services Provided* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *9*
    *D.   Payments* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *9*

*V.   LEGAL ANALYSIS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *10*
    *A.   Count I: Unpaid Wages Claim* . . . . . . . . . . . . . . . . . . . . . . . *10*
        *1.   Parties' arguments* . . . . . . . . . . . . . . . . . . . . . . . . . . *10*
        *2.   Terms "employee" and "wages"* . . . . . . . . . . . . . . . . . . . . *11*
    *B.   Count II: Breach of Contract Claim* . . . . . . . . . . . . . . . . . . . . *13*
        *1.   Parties' arguments* . . . . . . . . . . . . . . . . . . . . . . . . . . *13*

|  | 2. | *The elements and affirmative defense* . . . . . . . . . . . . . . . . . | *13* |
|---|---|---|---|
|  | 3. | *Language of the Consulting Agreement* . . . . . . . . . . . . . . . | *14* |
|  | 4. | *Material breach* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | *17* |

**VI.  DISPOSITION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **19**

## I.  INTRODUCTION

The matter before the court is Defendant Yellow Book USA, Inc.'s ("Yellow Book") Motion for Summary Judgment ("Motion") (docket no. 16).

## II.  PROCEDURAL BACKGROUND

On May 30, 2006, Plaintiff The Arthur L. Christoffersen Irrevocable Trust ("Trust"), by and through its co-trustees, Theresa A. Christoffersen, Dawn Christoffersen Minkoff and Eric Matthew Christoffersen, filed a Second Amended Petition and Jury Demand ("Petition") in the Iowa District Court in and for Linn County.

On June 21, 2006, Yellow Book removed the matter to this court. In the court's October 11, 2006 order, it concluded that Yellow Book's invocation of the court's diversity jurisdiction was appropriate. *See* Order (docket no. 12).

The Petition contains two claims. Count I of the Petition alleges a violation of the Iowa Wage Payment Collection Law ("Iowa Act"), through which the Trust seeks unpaid wages ("Unpaid Wages Claim"). Count II of the Petition alleges breach of contract ("Breach of Contract Claim"). On June 28, 2006, Yellow Book filed an Answer.

On November 28, 2006, Yellow Book filed the instant Motion. On January 16, 2007, the Trust filed a resistance to the Motion ("Resistance"). On January 25, 2007, Yellow Book filed a reply ("Reply"). Neither party requested oral argument, and the court finds it unnecessary. Finding the Motion to be fully submitted and ready for decision, the court turns to consider it.

2

## III. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only when the record shows that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005). An issue of fact is "genuine" if it has a real basis in the record, *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)), or when "'a reasonable jury could return a verdict for the nonmoving party' on the question." *Woods*, 409 F.3d at 990 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A fact is material when it is a fact "'that might affect the outcome of the suit under the governing law . . . .'" *Johnson v. Crooks*, 326 F.3d 995, 1005 (8th Cir. 2003) (quoting *Anderson*, 477 U.S. at 248). In considering a motion for summary judgment, a court must view all facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus.*, 475 U.S. at 587-88. Further, the court must give such party the benefit of all reasonable inferences that can be drawn from the facts. *Id.* at 587.

Procedurally, the moving party bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel,* 953 F.2d at 394 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Once the moving party has successfully carried its burden under Rule 56(c), the nonmoving party has an affirmative burden to go beyond the pleadings and by depositions, affidavits, or otherwise, designate "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 248. The nonmoving party must offer proof "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

3

## IV. MATERIAL FACTS

Viewing the facts in the light most favorable to the Trust and affording it all reasonable inferences, as the law requires, *see Baer Gallery, Inc. v. Citizen's Scholarship Found. of Am.,* 450 F.3d 816, 820 (8th Cir. 2006) (citing *Drake ex rel. Cotton v. Koss*, 445 F.3d 1038, 1042 (8th Cir. 2006)), the court finds the following facts for purposes of the Motion:

### A. Parties

Arthur L. Christoffersen ("Decedent") was the President and Chief Executive Officer ("CEO") of McLeodUSA Publishing Company ("McLeod"). During his tenure as President and CEO of McLeod, Decedent led the company from 200 employees and $20 million in revenue to 2,500 employees and $260 million in revenue. As an employee of McLeod, Decedent earned compensation and benefits (including incentives) of substantial value. During 2001, for example, Decedent's salary and bonuses totaled $300,000.00.

On about April 16, 2002, a transaction occurred in which the stock of McLeod was acquired by another entity, and Yellow Book now claims that it is the successor-in-interest to McLeod for purposes of this lawsuit.

Yellow Book is a subsidiary of Yell Group plc ("Yell Group"), which is based in the United Kingdom. In a memorandum dated August 5, 2002 ("Memo"), the CEO of Yell Group, John Condron, wrote to Decedent. The first sentence of the Memo provides: "I am pleased to inform you that you have been selected to participate in the [Yell Group] McLeod Management Incentive Compensation Plan (the 'Plan')." Appendix in Support of Plaintiff's Resistance to Defendant's Motion for Summary Judgment ("Pl. App.") (docket no. 19-3), at 24. The Memo states that Decedent's "cash bonus opportunity under the Plan is in the amount of $2,500,000.[00,]" and it noted his eligibility for stock options. *Id.* The Memo stated that, in order to receive the benefits, Decedent had to be "employed by McLeod or one of its subsidiaries on the respective bonus payment dates referred to [in

4

the Memo] . . . ." *Id.* The Plan was conditioned on the completion of Yell Group's initial public offering ("IPO") in the London Stock Exchange by September 30, 2002. The Memo stated that, if the IPO failed to occur on time, Yell Group would "consider establishing another incentive compensation plan for McLeod management." *Id.*

On September 16, 2002, Decedent resigned his employment with Yellow Book.

The IPO occurred in July of 2003. Awards were made to Yellow Book employees as a result of the July of 2003 IPO. It is not possible to determine the amount of the award Decedent would have received had he still been President and CEO of Yellow Book in July of 2003. On July 13, 2003, President and CEO of Yellow Book, Joseph A. Walsh, sent a memorandum to participants in the Plan, informing them that Yell Group had announced the IPO and that participants in the Plan were entitled to "payment of the cash bonus" and could exercise their stock options. *Id.* at 22.

On December 21, 2005, Decedent died at the age of fifty-nine.

### B. *Contracts*

On September 16, 2002, Decedent entered into two agreements with Yellow Book. He executed a separation and release agreement ("Release") (Defendant's Appendix in Support of its Motion for Summary Judgment ("Def. App.") (docket no. 16-4), at 1-7) and a document titled "Agreement" (hereinafter "Consulting Agreement") (*Id.* at 8-12). Yellow Book drafted both contracts. The Release allowed Decedent "a period of up to twenty-one (21) days from the date of [the Release]" to "review and consider [the Release]" prior to execution, as well as a "seven (7) day period" in which Decedent was "entitled to revoke [the Release]" after its execution. *Id.* at 5, ¶¶ 17 & 19.[1] It further provides that, if Decedent "so revokes, [the Release] and the Consulting Agreement shall

---

[1] The court notes that the Release contains two paragraphs that are numbered paragraph 16, and it is missing a paragraph 18. Def. App. at 4-5, ¶¶ 16, 16, 17 & 19.

be null and void and of no force and effect, except that the [Decedent]'s resignation as set forth in paragraph 1 [of the Release] shall remain effective." *Id.* at 5, ¶ 19.

### *1. Release*

On September 16, 2002, Decedent executed the Release. The Release is a five-page document that, in part, required Yellow Book to pay Decedent his normal salary through September 27, 2002, as well as accrued vacation leave. *See id.* at 1, ¶ 1. In the Release, Decedent is referred to as "Employee." *Id.* at 1. It provides that Decedent resigned "as an employee, officer and director . . . and as a trustee of all employee benefit plans and trusts of [Yellow Book], effective as of September 27, 2002 . . . ." *Id.* at 1, ¶ 1.

The Release also provides:

> 4. [Decedent] for [Decedent], [Decedent]'s heirs, executors, administrators and assigns, hereby unconditionally releases, discharges and acquits [Yellow Book], its subsidiaries, parents, and affiliates, and each of them, and its and their respective officers, directors, shareholders, partners, employees, agents and affiliates, and each of them (hereinafter collectively referred to as "Releasees") from any and all debts, agreements, promises, liabilities, claims, damages, actions, causes of action, or demands of any kind or nature including, without limitation, all claims of wrongful discharge, breach of contract, intentional inflection of emotional distress, breach of alleged implied covenant of good faith and fair dealing, invasion of privacy, defamation, race, age or sex discrimination, or discrimination based on any other ground, including but not limited to those arising under the Age Discrimination in Employment Act, Title VII of the Civil Rights Act of 1964, the Employee Retirement Income Security Act of 1974, the Fair Labor Standards Act, the Americans with Disabilities Act, the Family and Medical Leave Act of 1993, the WARN Act, and all other federal, state and local equal employment, fair employment, civil or human rights laws, codes and ordinances, in each case as amended to date, regardless of whether such claims are past, present, or future, personal or representative, known or unknown, or arising out

6

of any occurrence to date and expressly including but not limited to any liability arising out of or in connection with the employment of [Decedent] by [Yellow Book], or the termination thereof, and claims for attorneys' fees and costs, and any and all forms of compensation, including without limitation any incentive awards or bonuses, and all rights under Yell Group plc McLeod Management Incentive Plan, relating to such employment.

5. It is understood and agreed that the release set forth in the preceding paragraph is intended as and shall be deemed to be a full and complete release of any and all claims that [Decedent] may or might have against Releasees, or any of them, arising out of any occurrence arising on or before the date of this [Release] and said release is intended to cover and does cover any and all future damages not now known to [Decedent] or which may later develop or be discovered, including all causes of action therefor and arising out of or in connection with any occurrence arising on or before the date of this [Release].

. . .

7. [Decedent] hereby covenants not to sue or bring any claim against Releasees and acknowledges and agrees that this [Release] may be pleaded as a full and complete defense to, and may be used as the basis for an injunction against, any action, claim, suit or other proceeding that may be instituted, prosecuted or attempted in breach of this [Release].

*Id.* at 2-3, ¶¶ 4, 5 & 7. The Release also contains a confidentiality agreement (*id.* at 7, Ex. A), and an integration clause (*id.* at 4, ¶ 10).

The Release indicates that Decedent and Yellow Book entered into a second agreement on the same date. It provides, in part: "In consideration of [Decedent]'s agreement to and acceptance of this [Release], . . . [Yellow Book] has entered into a Consulting Agreement with [Decedent] dated the date hereof . . . ." *Id.* at 1, ¶ 2.

7

### *2. Consulting Agreement*

On September 16, 2002, Decedent also executed the Consulting Agreement (*id.* at 8-12) that is discussed in paragraph 2 of the Release (*see id.* at 1, ¶ 2). The Consulting Agreement provides that "Yellow Book engage[d] [Decedent] in a consulting capacity . . . ." *Id.* at 8, § 1. The Consulting Agreement engaged Decedent "for a term of five years beginning on November 1, 2002[,] and ending on October 31, 2007." *Id.* It required Decedent to "devote up to twenty (20) hours per month at times convenient to the parties for the performance of services for Yellow Book." *Id.* It further provides that, "[i]f Yellow Book does not require twenty (20) hours of service from [Decedent] in any month, Yellow Book may accrue up to forty (40) hours of such unused time which [Decedent] will provide at a later date as is mutually convenient for the parties." *Id.* The Consulting Agreement states that "[Decedent] shall not be required to provide services for any unused time in excess of the forty (40) hours of accrued, unused time." *Id.*

The "services" provision of the Consulting Agreement provides:

> Services. [Decedent]'s services to be performed include the following:
>
> A.   [Decedent] shall investigate and review possible merger or acquisition opportunities for Yellow Book.
>
> B.   From time to time, [Decedent] may be requested to be available to executive officers of Yellow Book for consultation.
>
> C.   [Decedent]'s services shall be performed at times and places as shall be mutually convenient for [Decedent] and Yellow Book.

*Id.* at 8, § 2 (emphasis in original).

The compensation provision of the Consulting Agreement provides:

> During the term of this [Consulting] Agreement, [Decedent] shall be paid as compensation for services Sixteen Thousand

8

> Six Hundred Sixty-Seven and no/100 Dollars ($16,667.00) each month commencing on November 1, 2002 and continuing on the first day of each month thereafter through October 1, 2007.

*Id.* at 9, § 3. The Consulting Agreement deems Decedent an independent contractor, rather than an employee, and it states that he "shall not participate in any employee benefit program of Yellow Book[.]" *Id.* at 9, § 6.

Decedent agreed to protect "confidential information" (*id.* at 9, § 5), and he agreed to a noncompetition clause (*id.* at 10, § 9). Decedent agreed to protect Yellow Book's trade secrets, and he agreed that he would "not directly or indirectly own, manage, control, participate in, consult with, render services for, or in any manner engage in any business competing with the businesses of Yellow Book" for a specified period of time and for a specified geographical area. *Id.* at 10, § 9.

The Consulting Agreement contains an integration clause. *Id.* at 11, § 11.

### C. Services Provided

Yellow Book never requested that Decedent perform any services under the Consulting Agreement.

### D. Payments

Yellow Book made monthly payments of $16,667.00 to Decedent from November 1, 2002, through December 1, 2005. Those payments totaled $633,346.00.

After Decedent's death on December 21, 2005, Yellow Book notified Decedent's attorney that Yellow Book would not make further payments under the Consulting Agreement. The December 1, 2005 payment was the last payment Yellow Book made under the Consulting Agreement.

There is no provision in either the Release or Consulting Agreement that explicitly discusses how the event of Decedent's death prior to October 1, 2007, would impact the

9

agreements. During the negotiations leading up to the execution of the Release and Consulting Agreement, the parties did not engage in any discussions concerning the effect of Decedent's death on any remaining payments under the Consulting Agreement.

## V. LEGAL ANALYSIS

The parties do not dispute that Iowa law should be applied to both of the Trust's claims.[2] *See generally Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938) (determining that federal courts whose jurisdiction is based solely on diversity must apply state, rather than federal, substantive law in order to prevent parties from forum shopping). Therefore, the court will apply Iowa law.

### A. Count I: Unpaid Wages Claim

#### 1. Parties' arguments

Yellow Book argues that it is entitled to judgment as a matter of law on the Trust's Unpaid Wages Claim, because the Trust is not asserting a claim on behalf of an "employee," a requirement under the Iowa Act. It alternatively argues that the Unpaid Wages Claim is barred by paragraphs 4, 5 and 7 of the Release.

The Trust responds that Yellow Book's focus on the term "employee" is wrong, and that the focus should be on the Iowa Act's definition of "wages." It argues that, the payments at issue are "wages" because they are severance payments. In response to Yellow Book's alternative argument, the Trust argues that the words "on or before" in paragraph 5 of the Release are controlling. It argues that the Release only released Yellow Book from wrongful acts that occurred on or before September 16, 2002.

---

[2] Both the Consulting Agreement and the Release provide that Iowa law shall govern. *See* Def. App. at 4, ¶ 14 ("[The Release] shall be governed by and construed in accordance with the laws of the State of Iowa, without regard to conflict of laws principles."); *id.* at 12, § 13 (<u>Applicable Law</u>. [The Consulting Agreement] will be performed at least in part in Linn County, Iowa[,] and shall be governed, construed and enforced in accordance with the laws of Iowa." (emphasis in original)).

10

### 2. Terms "employee" and "wages"

The Iowa Act requires that "[a]n employer shall pay all wages due its employees . . . ." Iowa Code § 91A.3(1) (2007). Iowa Code section 91A.2(4) provides a definition for "wages":

> 4. "Wages" means compensation owed by an employer for:
>
> a. Labor or services rendered by an employee, whether determined on a time, task, piece, commission, or other basis of calculation.
>
> b. Vacation, holiday, sick leave, and severance payments which are due an employee under an agreement with the employer or under a policy of the employer.
>
> c. Any payments to the employee or to a fund for the benefit of the employee, including but not limited to payments for medical, health, hospital, welfare, pension, or profit-sharing, which are due an employee under an agreement with the employer or under a policy of the employer. . . .
>
> d. Expenses incurred and recoverable under a health benefit plan.

*Id.* § 91A.2(4). It provides a definition for the term "employee":

> 3. "Employee" means a natural person who is employed in this state for wages by an employer. Employee also includes a commission salesperson who takes orders or performs services on behalf of a principal and who is paid on the basis of commissions but does not include persons who purchase for their own account for resale.

*Id.* § 91A.2(3). The term "employer" is also defined in the statute:

> 4. "Employer" means a person . . . who in this state employs for wages a natural person. *An employer does not include* a client, patient, customer, or other person who obtains professional services from *a licensed person who provides the services* on a fee service basis or *as an independent contractor*.

11

*Id.* § 91A.2(4) (emphasis added). If "an employer has intentionally failed to pay an employee wages," the employee may collect liquidated damages, court costs and attorneys' fees, in addition to the wages. *Id.* § 91A.8; *see Dallenbach v. MAPCO Gas Prods., Inc.*, 459 N.W.2d 483, 488-89 (Iowa 1990) (holding that an "intentional violation of section 91A.3 subjects and employer to liability for unpaid wages or expenses, liquidated damages, court costs, and attorney[s'] fees").

The purpose of the Iowa Act "is to facilitate the collection of wages owed to employees . . . ." *Williams v. Davenport Commc'ns Ltd. P'ship*, 438 N.W.2d 855, 857 (Iowa Ct. App. 1989). Because the Iowa Act is a remedial public welfare law, it should be "liberally interpreted." *First Iowa State Bank v. Iowa Dep't of Natural Res.*, 502 N.W.2d 164, 166 (Iowa 1993).

The plain language of the Iowa Act shows that the legislature intended to exclude independent contractors from its benefits. *See* Iowa Code § 91A.2(4) (excluding from the definition of "employer" someone who obtains professional services from an "independent contractor"); *see also Miller v. Component Homes, Inc.*, 356 N.W.2d 213, 216 (Iowa 1984) (stating that "[t]he [Iowa A]ct by its terms protects only 'employees'—not independent contractors"). Here, Yellow Book cannot be considered Decedent's "employer," because the Consulting Agreement explicitly provides that Decedent is an "Independent Contractor." Def. App. at 9, § 16. Although Decedent is called the "employee" throughout the Release, the parties agrees that his separation date was September 27, 2002. After that date, he was no longer an "employee" under the Iowa Act. Moreover, the Trust is seeking payments for the period following Decedent's death in December of 2005. A decedent cannot be an employee.

12

Accordingly, the court shall grant the Motion on Count I of the Petition.[3] The Trust's Unpaid Wages Claim fails as a matter of law.

### B. Count II: Breach of Contract Claim

#### 1. Parties' arguments

Yellow Book argues that the Trust's Breach of Contract Claim also fails as a matter of law. It argues that the claim fails because the Release and Consulting Agreement do not oblige it to make payments after Decedent's death. Yellow Book argues that, under the rules of contract interpretation and construction, its obligation to make the payments under the Consulting Agreement evaporated when Decedent died.

In the Resistance, the Trust argues that Decedent's death does not excuse Yellow Book from making payments under the Consulting Agreement. It first argues that the contractual requirement that Decedent make himself available for services was not a "material component" of Yellow Book's consideration. It further argues that, even if Decedent's death could be considered a breach of the Consulting Agreement, that breach did not necessarily excuse Yellow Book's performance. It argues that summary judgment is not appropriate on the Breach of Contract Claim, because there are material issues of fact present as to the materiality of Decedent's breach.

#### 2. The elements and affirmative defense

The complaining party in a breach of contract action must prove the following elements:

> (1) the existence of a contract; (2) the terms and conditions of the contract; (3) that it has performed all the terms and conditions required under the contract; (4) the defendant's

---

[3] Due to this ruling, the court shall not consider Yellow Book's alternative argument that the Release bars the Unpaid Wages Claim.

> breach of the contract in some particular way; and (5) that plaintiff has suffered damages as a result of the breach.

*Molo Oil Co. v. River City Ford Truck Sales, Inc.*, 578 N.W.2d 222, 224 (Iowa 1998).

A defendant has an affirmative defense to a breach of contract claim when a party's "performance was conditioned on the reciprocal performance" of the other party. *Van Oort Constr. Co. v. Nuckoll's Concrete Serv., Inc.*, 599 N.W.2d 684, 691-92 (Iowa 1999). The Iowa Supreme Court has stated that the rule is as follows: "'[I]t is a condition of each party's remaining duties to render performances to be exchanged under an exchange of promises that there be no uncured material failure by the other party to render any such performance due at an earlier time.'" *Id.* (quoting Restatement (Second) of Contracts § 237, at 215 (1981)). Among other factors, "[t]o determine the materiality of the breach, the Restatement (Second) of Contracts 'looks to the injured party and asks to what extent that party will be deprived of the benefit it reasonably expected . . . .'" *Id.* (quoting II E. Allan Farnsworth, *Farnsworth on Contracts* § 8.16, at 496-97 (2d ed. 1998)).

### *3. Language of the Consulting Agreement*

The court assumes the Trust can establish elements one, two, three and five of the Breach of Contract Claim, and it focuses on element four, that is, whether Yellow Book breached the Consulting Agreement in some particular way. *See Molo Oil*, 578 N.W.2d at 224. It shall examine whether Yellow Book's duty to pay was discharged by a material breach by Decedent. *Van Oort Constr.*, 599 N.W.2d at 692.

Interpreting a contract's provisions is a matter of law for the court. *Magina v. Bartlett*, 582 N.W.2d 159, 163 (Iowa 1998). The intent of the parties must control. *Id.* "In interpreting a contract under Iowa law, [the court] must first examine the plain language of the contract." *Midwest Oilseeds, Inc. v. Limagrain Genetics Corp.*, 387 F.3d 705, 711 (8th Cir. 2004). If the contract's terms are clear and the writing is complete, "the parol evidence rule forbids the use of extrinsic evidence to vary, add to, or subtract from a written agreement." *Montgomery Props. Corp. v. Econ. Forms Corp.*, 305

14

N.W.2d 470, 476 (Iowa 1981) (citing *Associated Grocers of Iowa Coop., Inc. v. West*, 297 N.W.2d 103, 109 (Iowa 1980)). The court "may not substitute a different meaning for that which the parties clearly intended and embodied in unambiguous terms." *Midwest Oilseeds*, 387 F.3d at 711. The court analyzes disputed language in a contract "in the light of all the circumstances." *Fausel v. JRJ Enters., Inc.*, 603 N.W.2d 612, 618 (Iowa 1999); *see Magina*, 582 N.W.2d at 163 (explaining that the Iowa Supreme Court gives "effect to language of the entire contract in accordance with its commonly accepted and ordinary meaning").

The Consulting Agreement and Release are integrated agreements. "An integrated agreement is a writing or writings constituting a final expression of one or more terms of an agreement." Restatement (Second) of Contracts § 209(1) (1981) (quoted in *Passehl Estate v. Passehl*, 712 N.W.2d 408, 415 (Iowa 2006)). Both the Consulting Agreement and the Release refer to each other but are self-contained by their own terms, each including an unambiguous integration clause.[4] *See id.* § 209(3) (stating that instruments that reasonably appear to be a fully integrated agreement are "taken to be an integrated agreement unless it is established by other evidence that the writing did not constitute a final expression"). There is no evidence of a subsequent modification of the written agreements, whether oral or written. The two writings form the fully integrated agreement between Decedent and Yellow Book.

Moreover, the plain language of the Consulting Agreement is clear. "[A] contract is not ambiguous merely because the parties disagree over its meaning." *Hartig Drug Co. v. Hartig*, 602 N.W.2d 794, 797 (Iowa 1999) (quoting *Tom Riley Law Firm, P.C. v. Tang*,

---

[4] The Consulting Agreement states that it is "the entire agreement among the parties . . . and supersedes all prior agreements . . . ." Def. App. 11, at ¶ 11. The Release also states that it "sets forth the entire agreement between the parties regarding [Decedent]'s separation from [Yellow Book and] supersedes any prior written, oral or implied agreement . . . ." Def. App. 4, at ¶ 10.

15

521 N.W.2d 758, 759 (Iowa Ct. App. 1994)). Instead, ambiguity exists when there is real uncertainty as to which party's interpretation is correct. *Id.* (citing *Berryhill v. Hatt*, 428 N.W.2d 647, 654 (Iowa 1988)). Here, the terms of the Consulting Agreement unequivocally state that Yellow Book's payments are consideration for services. It provides that, "[d]uring the term of this [Consulting] Agreement, Decedent shall be paid as compensation for services . . . $16,667.00[] each month commencing on November 1, 2002 and continuing on the first day of each month thereafter through October 1, 2007." Def. App. at 9, at § 3. The Consulting Agreement also provides that Yellow Book would supply Decedent with a computer, dial-up email and internet access, reimbursement for expenses and "secretarial assistance." (*Id.* at 9, § 4). No language in the Consulting Agreement or the Release refers to ongoing payments to Decedent for any purpose other than for his services. No language provides for either the continuation or cessation of payments in the event of Decedent's incapacitation or death. Under the express terms of the agreements negotiated by sophisticated parties, the parties determined that Yellow Book was required to pay Decedent for his services. That is the only reasonable interpretation of the Consulting Agreement, given its plain language.

Because the Consulting Agreement and the Release are the fully integrated written agreement between the parties and the language in the contracts is clear, the court shall not allow parol evidence. *See Smidt v. Porter*, 695 N.W.2d 9, 21 (Iowa 2005) (explaining that the parol evidence rule excludes evidence of promises that would "modify or supplement the terms of the written agreement"). It is inconsequential that Decedent surrendered a potentially large bonus and made other concessions when signing the Release. The writings do not provide that these things are to be consideration for Yellow Book's payments under the Consulting Agreement.

16

### 4. *Material breach*

Decedent's unavailability is a failure to perform under the Consulting Agreement's terms. "'A party breaches a contract when, without legal excuse, it fails to perform any promise which forms a whole or a part of the contract.'" *Wilson v. Vanden Berg*, 687 N.W.2d 575, 583 (Iowa 2004) (quoting *Molo Oil*, 578 N.W.2d at 224 (modification in *Wilson* omitted)). The Consulting Agreement requires Decedent to devote up to twenty hours per week to performing services for Yellow Book. *See* Def. App. at 8, §§ 1 & 2. Thus, the Consulting Agreement required that Decedent be available to perform services at a convenient time, even if Yellow Book did not request his services. The Consulting Agreement requires Decedent to "use his best efforts to promote the business of Yellow Book" during the term of the Consulting Agreement. Def. App. at 10, § 8. Because Decedent is no longer available to perform these services, he is in breach of the Consulting Agreement.

The question then becomes whether such breach is material, and, whether such question is one for the jury. The court turns to consider whether Decedent's death released Yellow Book from the duty to make further payments.

A party must perform on its promises unless there is an "uncured material failure by the other party to render" a performance already due. *Van Oort Constr.*, 599 N.W.2d at 691 (citing Restatement (Second) of Contracts § 237 (1981)). Once one party commits a material breach of the contract, the other is no longer obligated to continue performing, that is, they are discharged from their duty to perform. *Id.* However, the non-breaching party must show that the breached condition "constituted the entire agreed exchange by the other party, or was *expressly recognized in the bargain as a condition for the other's performance*" in order to discharge its own obligations. *Union Story Trust & Sav. Bank v. Sayer*, 332 N.W.2d 316, 322 (Iowa 1983) (emphasis added). Here, the undisputed facts show that, under the Consulting Agreement, Yellow Book was required to make payments

17

in exchange for Decedent's services.  The court holds that Decedent's availability for performance of services was "expressly recognized in the bargain as a condition" for Yellow Book's performance, that is, Yellow Book's obligation to make monthly payments. *See* Def. App. at 9, § 3 ("[Decedent] shall be paid *as compensation for services* . . . ." (emphasis added)).  Thus, Decedent's death was a material breach of the Consulting Agreement that discharged Yellow Book from its obligation to make monthly payments. There are no material facts in dispute as to whether Decedent's breach was material.

The Trust cannot establish the elements for its Breach of Contract Claim—it has not presented evidence from which a reasonable jury could find that Yellow Book breached the Consulting Agreement.  *Molo Oil*, 578 N.W.2d at 224.  The Consulting Agreement was cancelled at the moment of Decedent's death.  *See In re Groom's Estate*, 216 N.W. 78, 80 (Iowa 1927) ("Where a contract is of such nature that for its proper performance . . . confidence and trust are reposed in the performer personally, or where the attainment of its object requires his personal services or skill . . . [it] does not survive [death]."); *see also* 30 Williston on Contracts § 77:72 (4th ed. 2007) ("Death cancels a personal services contract.  Indeed, death . . . makes performance itself impossible.").

The court shall grant the Motion as to Count II of the Petition.  The Trust's Breach of Contract Claim fails as a matter of law.

18

## VI.  DISPOSITION

For the foregoing reasons, the court hereby **ORDERS**:

(1)  Yellow Book's Motion (docket no. 16) is **GRANTED**

(2)  The Clerk of Court is directed to **DISMISS** the Petition (docket no. 1);

(3)  The Clerk of Court is directed to **ENTER JUDGMENT** in favor of Yellow Book;

(4)  Each party is directed to pay its own costs; and

(5)  The final pretrial conference and trial are cancelled.

**IT IS SO ORDERED.**

**DATED** this 6th day of September, 2007.

_(signature)_
LINDA R. READE
CHIEF JUDGE, U.S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA